UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARRY SCHOETTLER,<br><br>                    Plaintiff,<br><br>          v.<br><br>WACHOVIA CORPORATION/WACHOVIA<br>CORPORATION LONG-TERM DISABILITY<br>PLAN, and LIBERTY LIFE ASSURANCE<br>COMPANY OF BOSTON,<br><br>                    Defendants. | 1:08-CV-00174 OWW DLB<br><br>MEMORANDUM DECISION AND<br>ORDER RE DEFENDANTS' MOTION<br>FOR SUMMARY JUDGMENT |

## I.  INTRODUCTION

This case involves a claim by Harry Schoettler, a former employee of Wachovia Corporation (Wachovia), for benefits allegedly owed to him under Wachovia's long-term disability plan.  Plaintiff asserts that his long-term disability benefits were improperly terminated.  Before the court are motions for summary judgment collectively brought by defendants Wachovia Corporation (Wachovia), Wachovia Corporation Long-Term Disability Plan, and Liberty Life Assurance Company of Boston ("Liberty Life").  The following background facts are taken from the parties' respective statements of undisputed material facts, responses and replies thereto, and other materials submitted in connection with the motion.

## II.  BACKGROUND

A.   **Plaintiff's Employment At Wachovia And Claim For Long-Term Disability Benefits**

Plaintiff worked for Wachovia from November 20, 1998, to July

1

15, 2002, and held the position of Senior Vice President/Investments. Plaintiff participated in the Wachovia Long Term Disability Benefit Plan (the "Wachovia Plan"), an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq. The Wachovia Plan is self-funded.

In or around 2001, plaintiff was diagnosed with Major Depressive Disorder, and he applied for long-term disability (LTD) benefits. By letter dated January 7, 2003, Liberty Life notified plaintiff that his claim for LTD benefits was approved. For benefits purposes, plaintiff was deemed to have satisfied the medical definition of disability as of July 16, 2002 – the day after he last worked for Wachovia – and due to the Wachovia Plan's "Elimination Period" of 26 weeks, plaintiff's LTD benefits became effective on January 14, 2003. On January 25, 2003, plaintiff began receiving monthly LTD benefits totaling $3,725.24 ($2,235.15 of which covered the period from January 14, 2003, to January 31, 2003).

B.   Plaintiff's Employment With Capitol Lending

In a letter dated December 3, 2003, plaintiff's attorney notified Liberty Life of plaintiff's prospective employment with Capitol Lending Group ("Capitol Lending"). In the letter, counsel stated that, if employed, plaintiff would be working as an independent contractor "receiving payment via a 1099 form" and counsel asked Liberty Life, "[o]nce Mr. Schoettler begins receiving the 1099 forms, would you want these forwarded on a monthly basis or on an as earned basis?" (Doc. 18, Ex. K at 1-2.) In a letter dated December 12, 2003, Liberty Life responded that once plaintiff

is employed "we will need verification of his earnings on a monthly basis in order to process his Long Term Disability benefit." (Doc. 18, Ex. L.)  On January 27, 2004, plaintiff submitted a "Claimant Supplementary Statement" in which he informed Liberty Life that he had returned to work as a professionally licensed, home loan officer.   In accordance with the request, on March 1, 2004, plaintiff notified Liberty Life that his February 2004 earnings from Capital Lending totaled $10,734.50.

### C. The Decision To Terminate LTD Benefits

In a letter dated March 11, 2004, Liberty Life, as the claims administrator, informed plaintiff's counsel that, given plaintiff's February 2004 earnings, it was denying plaintiff's LTD benefits as of the 1st of February.   In explaining the decision, Liberty Life quoted language from the Wachovia Plan (including the sections on Discontinuation of Benefits and Work Incentive Benefit) which discontinues LTD benefits when the participant's "Monthly Earnings" exceed or are equal to 80% of his "Pre-Disability Earnings." Liberty Life reasoned as follows:

> We have issued benefits based on Mr. Schoettler's monthly pre-disability income of $8,772.43; 80% of this figure is $7,017.94. Mr. Schoettler reported earnings of $10,734.50 for the month of February.  Since these earnings exceed 80% of his pre-disability income, he no longer qualifies for benefits beyond January 31, 2004. Therefore, we must deny benefits as of February 1, 2004.

Liberty life informed plaintiff of his right to, and how to, obtain a review of the denial.  Liberty Life also informed plaintiff that, should he decide to request a review, "include [in the request] any documentation which you feel will support your claim" and further noted that plaintiff could obtain copies of all documents relevant to his claim free of charge.

3

1       **A few weeks later, on April 1, 2004, plaintiff sent a**
2   **facsimile to Liberty Life containing documentation of his March**
3   **2004 earnings, which totaled $8,861.78.  Plaintiff stated in the**
4   **facsimile, "please re-open my claim if necessary." In response,**
5   **Liberty Life sent plaintiff a letter, dated April 5, 2004,**
6   **acknowledging receipt of his facsimile but also reminding plaintiff**
7   **that his claim had been closed.  Liberty Life pointed out that his**
8   **March 2004 earnings also exceeded 80% of his pre-disability income.**
9   **Liberty Life advised plaintiff that if he was intending to appeal**
10  **the decision, he needed to follow the procedures outlined in the**
11  **previous letter, which Liberty Life repeated.**

12      **D.   The First Appeal**

13      **On April 15, 2004, plaintiff's counsel wrote to Liberty Life**
14  **to seek reconsideration of the denial.   In his letter to Liberty**
15  **Life, counsel asserted that plaintiff's pre-disability income was**
16  **$16,392.80 per month, not $8,772.43 per month as indicated in the**
17  **denial.  Counsel further objected to the usage of one month's worth**
18  **of plaintiff's earnings from February 2004 – as opposed to taking**
19  **his earnings for an entire year and averaging them to get a**
20  **"Monthly" earnings figure – as a basis for terminating plaintiff's**
21  **LTD benefits.   Four days later, Liberty Life referred plaintiff's**
22  **file to its Appeals Unit to ensure a correct determination had been**
23  **made.   On April 30, 2004, plaintiff sent a facsimile to Liberty**
24  **Life containing documentation of his April 2004 earnings, which**
25  **totaled $11,558.14.**

26      **On May 12, 2004, after reviewing the file and additional**
27  **information supplied by plaintiff, including his pay stubs from**
28  **Wachovia for the period of July 1, 2001, through June 30, 2002,**

    **4**

Liberty Life informed plaintiff's counsel, via letter, that it was upholding the original decision and denying the appeal.  The letter reads, in part:

> Mr. Schoettler's annual salary provided to Liberty Mutual by Wachovia Corporation as of his date of disability was $105,269.10. Therefore his Monthly Pre-Disability Earning was $8,772.43 and 80% of this is $7,017.94. According to documentation received from Capital Lending Group, Mr. Schoettler's Monthly Earnings for the time period of February 1, 2004 through February 29, 2004 exceeded 80% of his Pre-Disability Earnings for the same time period as indicated below.  Mr. Schoettler has since submitted his pay stubs from Capital Lending Group for March and April 2004, which also exceed 80% of his Pre-Disability Earnings as indicated below.
>
> . . . .
>
> Since Mr. Schoettler exceeded 80% of his monthly Pre-Disability Earnings he is no longer eligible to receive Long Term Disability benefits.

Liberty Life noted that it was bound to "abide by the provisions [of] the Wachovia Corporation Long Term Disability plan" and could not alter its original decision.  The letter advised plaintiff that he could appeal the decision to Wachovia's Benefits Committee within 60 days and, in connection therewith, "he may submit any additional information or comments he deems pertinent for review."

E.    The Second Appeal

On May 26, 2004, plaintiff's counsel appealed the decision to Wachovia's Benefits Committee.  In his appeal letter, plaintiff continued to assert that his monthly pre-disability income was $16,392.80 per month (based on an annualized income of $196,713.67 for the twelve months preceding his disability).  And again, plaintiff asserted that interpreting the term "Monthly" earnings to mean a single month's worth of earnings was erroneous.  On June 10,

2004, Wachovia wrote plaintiff's counsel and informed him that the appeal had been received.  Wachovia's letter advised to promptly provide "all relevant information that you wish to have included in the review."

In a letter dated September 2, 2004, Wachovia's Benefits Committee issued its decision upholding the denial.  The Committee's letter asserted that "[b]ased on the information received the Committee has determined the provisions of the Plan have been applied appropriately."  The Committee's letter set forth a step-by-step analysis of how it arrived at its decision.

First, the Committee articulated the reason for the denial: "[t]he Claims administrator denied Mr. Schoettler's LTD claim because beginning February 1, 2004, Mr. Schoettler's Monthly Earnings exceeded 80% of his Pre-Disability Earnings (those terms are defined below)."  No new basis for the denial was asserted.

The Committee then cited the Wachovia Plan's rule on Discontinuation of Benefits that requires a cessation of LTD benefits on "the date the Participant's Monthly Earnings exceed 80% of his or her Pre-Disability Earnings," citing Section 3.4(c).[1]

_____

[1]   In submitting the Wachovia Plan with their moving papers (see Beaver Decl. Ex. C), defendants have inadvertently omitted the page on which Section 3.4(c) appears.  This omission is immaterial because plaintiff does not dispute that the Plan contains Section 3.4(c) and this Section provides for the cessation of LTD benefits on the "date the Participant's Monthly Earnings exceed 80% of his or her Pre-Disability Earnings." (Doc. 16, UMF 6) (Doc. 23, UMF 6.) In their moving papers, defendants also initially omitted Section 3.7(d)(4) of the Wachovia Plan, which similarly provides for the cessation of LTD benefits if the participant's "Monthly Earnings" are greater than or equal to 80% of his "Pre-Disability Earnings." Defendants, however, submitted this section with their reply papers.

The Committee then explained, in specific detail, the various definitions in the Wachovia Plan and how they applied to plaintiff. The Committee started with the definition of Monthly Earnings.

> The definition of Monthly Earnings appears in Section 1.1 of the Plan as follows:
>
> > 'Monthly Earnings' means the Participant's earnings from all employment.

The letter then addressed how the Committee determined plaintiff's "Pre-Disability Earnings," the other major factor of the equation. To arrive at plaintiff's Pre-Disability Earnings, the Committee engaged in at least five analytical steps, working its way through several Wachovia Plan terms, including: Pre-Disability Earnings, Rolling Twelve Month Amount, Earnings, Compensation, and Eligible Functional Incentive Pay.  As the Committee explained:

> Mr. Schoettler's Pre-Disability Earnings is equal to 70% of his 'eligible functional incentive pay' (as defined in the Plan). However, to get [to] that point, one must work through several layers of definitions. The definition of Pre-Disability Earnings (the beginning point) is found in Plan Section 3.1(b)(6):
>
> > (6)  <u>Pre-Disability Earnings</u> or <u>BEC</u> means the greatest of the following three figures divided by 12 (i.e., the number of months in a calendar year):
> >
> > > (i) the Participant's Grandfathered ABBR;
> > > (ii) the Participant's Comp Rate; and
> > > (iii) the Participant's Rolling Twelve Month Amount...."
>
> From your correspondence, it appears you agree that the (i) and (ii) do not apply to Mr. Schoettler. . . . Mr. Schoettler was a commission based employee. Thus, Mr. Schoettler's Pre-Disability Earnings will be determined by his 'Rolling Twelve-Month Amount.'
>
> The definition for 'Rolling Twelve Month Amount' appears in Plan Section 3.1(b)(7). Because Mr. Schoettler had worked for Wachovia Corporation for twelve months preceding his disability, his Rolling Twelve Month Amount is 'the sum of the Participant's Earnings (as defined below) for such twelve (12) consecutive calendar months.'

7

(See Plan Section 3.1(b)(7)(i)(1)).

Earnings is defined in Plan Section 3.1(b)(7)(i)(4) as follows:

> (4) Definition of Earnings. *** A Participant's Earnings for a particular month is equal to the greatest of (i) the Participant's Compensation for that month, (ii) one-twelfth (1/12th) of the Participant's Grandfathered ABBR for that month or (iii) one-twelfth (1/12th) of the Participant's Comp Rate for that month.

As previously noted Mr. Schoettler does not have a Grandfathered ABBR nor does Mr. Schoettler have a Comp Rate. Accordingly, Mr. Schoettler's Earnings will be determined by his Compensation.

Compensation is located in Plan Section 3.1(b)(4) and provides in part the following:

> (4) Compensation means the sum of a Participant's
>
> (i) base salary;
> (ii) hourly wages;
> (iii) seventy percent (70%) of 'eligible functional incentive pay' (as set forth in Appendix B); and
> . . . .

As previously indicated, Mr. Schoettler does not earn a salary or hourly wages. Thus, Mr. Schoettler's Compensation will be equal to 70% of his 'eligible functional incentive pay' (the ending point of this discussion of definitions).

The letter goes on to explain how, according to the Committee, plaintiff's Monthly Earnings exceeded 80% of his Pre-Disability Earnings, and analyzes the discrepancy between the Committee's and plaintiff's pre-disability earnings calculations:

> Appendix B of the Plan (of which I understand you have a copy) contains a list of commission and other incentive pay codes that make up eligible functional incentive pay. Not all forms of compensation Mr. Schoettler received are eligible functional incentive pay. This is the reason for the discrepancy you pointed out between the compensation you computed for Mr. Schoettler and the compensation recognized by the Plan.
>
> In your letter you indicate the total of Mr. Schoettler's pay stubs from 7/1/2001 to 6/30/2002 totals $190,713.67.

8

The Plan Administrator has re-confirmed that Mr. Schoettler's 'eligible functional incentive pay' for that period is $150,384.43 – and 70% of that amount is $105,269.10. The difference is that not all of the remuneration Mr. Schoettler received from Wachovia qualified as eligible functional incentive pay. If you would like a specific break down of this difference, please let me know. This should address your concern regarding the discrepancy between compensation you computed and the compensation recognized by the Plan.

You also argue that the definition of earnings is inconsistent. For purposes of determining if Mr. Schoettler's LTD benefits should cease under Plan Section 3.4(c), the Plan compares Mr. Schoettler's Monthly Earnings (his post-disability earnings) against 80% of Mr. Schoettler's Pre-Disability Earnings. As set forth above, Mr. Schoettler's Pre-Disability Earnings is equal to 70% of his eligible functional incentive pay (and that amount is then divided by 12 to get a monthly equivalent). 70% of Mr. Schoettler's eligible functional incentive pay for the twelve month period preceding his disability was $105,269.10. One-twelfth of this amount is $8,772.43. 80% of 8,772.43 is $ 7,017.94.

Next, under Plan Section 3.4(c), 80% of Mr. Schoettler's Pre-Disability Earnings is compared against his Monthly Earnings. The Plan Administrator has interpreted the definition of Monthly Earnings to include 100% of all compensation a disabled participant receives from all employment ('Monthly Earnings means the Participant's Earnings from all employment'). According to the information you and Mr. Schoettler provided, Mr. Schoettler received $10,734.50 from his employer in February 2004. Because $10,734.50 exceeded $7,017.94, Mr. Schoettler's LTD benefits ceased.

Finally, the letter addressed plaintiff's assertion in his appeal that using one month of pay (from February 2004) to compute a monthly figure was erroneous.

In your April 15, 2004 letter (which you attached to your May 26, 2004 letter) you argue that it is inconsistent to make the comparison required by Section 3.4(c) by using one number that represents a twelve month average of a participant's compensation (Pre-Disability Earnings) against the actual (no average) earnings received by the participant in one month (Monthly Earnings).

In response to this argument, we point out the following. The Plan Administrator is charged with exclusive right

9

and the sole discretionary authority to interpret the terms and provisions of the Plan and to resolve all questions arising under the Plan (see Section 4.3). The Plan Administrator has interpreted the Plan and the definitions cited in this letter in the manner set forth above. Moreover, a literal reading of the Plan requires this result. Plan Section 3.4(c) compares Monthly Earnings against Pre-Disability Earnings. The definition of Pre-Disability Earnings is clearly based on a twelve month average. There is no twelve month average concept in the term 'Monthly Earnings.'

Although the Plan uses different definitions of the term 'earnings' for different purposes, this is not 'inconsistent' — as you suggest — but simply the way the Plan is written.

The Committee advised plaintiff's counsel that he and plaintiff could obtain copies of all documents, records and other information relevant to plaintiff's claim free of charge.

   F. **Plaintiff's Lawsuit**

   Over three years after the Benefits Committee denied his appeal, plaintiff filed a one-count complaint against defendants alleging a claim for the "Recovery of Plan Benefits" under 29 U.S.C. § 1132(a)(1)(B).  Plaintiff alleges that "Defendants improperly terminated [his] disability benefits to which he is entitled under the terms of the Wachovia Disability Plan." (Compl. § 32.)

   Section 4.8 of the Plan provides the following one-year limitations period: "A claimant or the claimant's authorized representative cannot start any legal action: (a) until after the exhaustion of the administrative remedies under Section 4.7; nor (b) more than one (1) year after the time proof of claim is required under the claim procedures approved by the Plan Administrator."

   III.   **SUMMARY JUDGMENT STANDARD**

   Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show

10

1  that there is no genuine issue as to any material fact and that the

2  movant is entitled to judgment as a matter of law." Fed. R. Civ.

3  P. 56(c). A party moving for summary judgment "always bears the

4  initial responsibility of informing the district court of the basis

5  for its motion, and identifying those portions of the pleadings,

6  depositions, answers to interrogatories, and admissions on file,

7  together with the affidavits, if any, which it believes demonstrate

8  the absence of a genuine issue of material fact." *Celotex Corp. v.*

9  *Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted).

10      Where the movant will have the burden of proof on an issue at

11  trial, it must "affirmatively demonstrate that no reasonable trier

12  of fact could find other than for the moving party." *Soremekun v.*

13  *Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). With

14  respect to an issue as to which the non-moving party will have the

15  burden of proof, the movant "can prevail merely by pointing out that

16  there is an absence of evidence to support the nonmoving party's

17  case." *Id.* If the movant meets its initial burden, the non-movant

18  cannot defeat the motion by resting upon the allegations or denials

19  of its own pleading, rather the "non-moving party must set forth,

20  by affidavit or as otherwise provided in Rule 56, 'specific facts

21  showing that there is a genuine issue for trial.'" *Id.* (*quoting*

22  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

23  "Conclusory, speculative testimony in affidavits and moving papers

24  is insufficient to raise genuine issues of fact and defeat summary

25  judgment." *Id.*

26      In an ERISA case, "[w]here the decision to grant or deny

27  benefits is reviewed for abuse of discretion, a motion for summary

28  judgment is merely the conduit to bring the legal question before

1  the district court and the usual tests of summary judgment, such as

2  whether a genuine dispute of material fact exists, do not apply."

3  *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

4                **IV. <u>DISCUSSION AND ANALYSIS</u>**

5      **Defendants raise two arguments: (1) that plaintiff's claim is**

6  **time-barred by the contractual limitations period in the Wachovia**

7  **Plan; and (2) that the decision to terminate plaintiff's LTD**

8  **benefits must be upheld under an abuse of discretion standard.**

9      **Defendants' argument that plaintiff's claim is time-barred by**

10  **the contractual limitations period is an affirmative defense,** *Han*

11  *v. Mobil Oil Corp.*, 73 F.3d 872, 877-78 (9th Cir. 1995), that

12  defendants bear the burden of establishing, *Snell v. Bell Helicopter*

13  *Textron, Inc.*, 107 F.3d 744, 746 (9th Cir. 1997), *Edwards v.*

14  *Princess Cruise Lines, Ltd.*, 471 F. Supp. 2d 1027, 1030 (N.D. Cal.

15  2007).

16      **With respect to the second ground, an abuse of discretion**

17  **standard, which takes into account the structural conflict of**

18  **interests at play, is the appropriate standard to apply.** *See Burke*

19  *v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1024-

20  27 (9th Cir. 2008). **Defendants' summary judgment motion serves as**

21  **the conduit to bring before the court the legal question of whether,**

22  **in light of the structural conflict of interest, there has been an**

23  **abuse of discretion in denying plaintiff's LTD benefits.**

24      **A. <u>Contractual Limitations Period</u>**

25      **In this case, the applicable** *statute* **of limitations for**

26  **plaintiff's claim for the recovery of benefits is four years.** *Wetzel*

27  *v. Lou Ehlers Cadillac Group Long Term Disability Ins. Program*, 222

28  F.3d 643, 648-49 (9th Cir. 2000). **Plaintiff filed his claim within**

1  the applicable statutory time period.   Defendants invoke the
2  Wachovia Plan's shorter time period.

3      As a general rule of contract law, "it is well established
4  that, in the absence of a controlling statute to the contrary, a
5  provision in a contract may validly limit, between the parties, the
6  time for bringing an action on such contract to a period less than
7  that prescribed in the general statute of limitations, provided that
8  the shorter period itself shall be a reasonable period." *Order of*
9  *United Commercial Travelers of Am. v. Wolfe*, 331 U.S. 586, 608
10 (1947).   Many courts have applied this rule to claims brought under
11 ERISA. *See Scharff v. Raytheon Co. Short Term Disability Plan*, No.
12 EDCV 07-134 PSG(OPx), 2007 WL 2947566, at *7 (C.D. Cal. June 22,
13 2007) (collecting cases).   Here, no party disputes that a plan
14 provision can validly shorten the time by which an action for
15 benefits must be commenced to less than the statutory limitations
16 period, provided the shorter contractual period is reasonable. *Id.*
17 (concluding the same)*; Sousa ex rel. Will of Sousa v. Unilab Corp.*
18 *Class II (Non-Exempt) Members Group Benefit Plan,* 252 F. Supp. 2d
19 1046, 1055 (E.D. Cal. 2002) (same)*, aff'd,* 83 F. App'x 954 (9th Cir.
20 2003)*; see also Wetzel*, 222 F.3d at 650 (remanding the case to the
21 district court so it could determine whether the plaintiff's claim
22 for ERISA benefits was "contractually barred by the limitations
23 provision in the policy").   The parties dispute whether the
24 contractual limitations period was ever triggered.

25      Defendants argue that Liberty Life's letter of May 12, 2004,
26 denying the first appeal, contained language that triggered the
27 contractual limitations period.   Defendants, without analysis,
28 simply state: "In that letter, Liberty Life explained the reasons

why it was upholding its original decision and requested that Plaintiff submit any additional information to support his claim for benefits. [UFS 43-44] The May 12, 2004 letter constituted a request for proof pursuant to Section 4.8(b)." (Doc. 15 at 14.)

The May 12, 2004, letter provides in pertinent part:

- If Mr. Schoettler disagrees with this denial he may make a written request to Wachovia's Benefit Committee. He may submit any additional information or comments he deems pertinent for review.

The contractual limitations provision set forth in Section 4.8 provides:

- A claimant or the claimant's authorized representative cannot start any legal action: (a) until after the exhaustion of the administrative remedies under Section 4.7; nor (b) more than one (1) year after the time proof of claim is required under the claim procedures approved by the Plan Administrator.

A comparison between the language in the May 12, 2004, letter and the language of Section 4.8(b) reveals several infirmities in defendants' position.

First, the letter uses permissive language that does not signal that a proof of claim is required. The letter clearly states "you *may* submit any additional information." (Emphasis added.) Section 4.8(b) only applies, however, when proof of claim is "*required* under the claim procedures approved by the Plan Administrator." (Emphasis added.) Defendants did not require any proof of plaintiff in the May 12, 2004, letter. *See Schneider v. Unum Life Ins. Co. of Am.*, No. CV 05-1402-PK, 2007 WL 543045, at *7 (D. Or. Feb. 15, 2007) ("But at no time, either by correspondence or telephone call, did Unum use the terms 'proof of claim' *or inform Schneider that proof of claim was 'required.'*") (emphasis added).

14

       Second, the Wachovia Plan documents that defendants submitted do not contain a definition of the term "proof of claim" and defendants have not attempted to define the term nor identify where the definition of the term can be found.   During oral argument, defendants were unable to produce a copy of the "claim procedures approved by the Plan Administrator."   Defendants responded that the claim procedures approved by the Plan Administrator are set forth in Sections 4.6 and 4.7 of the Wachovia Plan.   These sections do not contain any definition of, or make any reference to, "proof of claim."

       Section 4.7 identifies two circumstances in which information is required from the claimant: (i) when the Claims Administrator notifies the claimant that an extension of time to render a decision is necessary "because the claimant has failed to provide information necessary to decide the claim" at which point "the claimant [has] 45 days . . . to provide the information requested"; and (ii) when the Claims Administrator denies a claim, the plan requires that the Claims Administrator provide a written notice to the claimant that includes a "description of any additional material or information necessary for the claimant to perfect the claim and an explanation as to why such information is necessary."   Even assuming, *arguendo*, that these quoted provisions constitute the "proof of claim" referred to in Section 4.8(b), these provisions are not implicated here.   There is no evidence that the Claims Administrator or anyone else notified plaintiff that an extension of time was necessary to render a benefits decision because he failed to provide the requisite information, and there is no denial letter in the record that provides a "description of any additional material or

information necessary to perfect" plaintiff's claim.

Third, under defendants' reasoning, practically any letter Liberty Life sent to plaintiff could trigger the contractual limitations period.  For example, Liberty Life's letter of March 11, 2004, told plaintiff that he "may request a review" of the denial, and if he does, "[i]n your request for review, include any documentation which you feel will support your claim." (Doc. 18, Ex. O at 3.)  This letter employed permissive not mandatory language and invited plaintiff to supply any additional information he desired.

Apart from the May 12, 2004, letter, defendants offer an alterative triggering event: "September 2, 2004, the date the Plan Administrator denied Plaintiff's appeal." (Doc. 15 at 15.) This contention departs from the text of Section 4.8(b), as Section 4.8(b) does not state that the one-year period begins to run from the date an appeal is denied.  Other than the May 12, 2004, letter and the September 2, 2004, final denial letter – neither of which invoke or refer to the language of Section 4.8(b) – defendants proffer no further triggering event.

Plaintiff argues that *Mogck v. Unum Life Insurance Co. of America*, 292 F.3d 1025 (9th Cir. 2002) eviscerates defendants' contractual limitations defense.  There, roughly two years after paying disability benefits, the defendant advised plaintiff in a letter that it was discontinuing payments. *Id.* at 1026-27.  The long-term disability policy at issue contained a provision that required claims to be brought no more than "three years after the time proof of claim is required." *Id.* at 1028.  The policy section entitled "Notice and Proof of Claim" provided that "[p]roof of continued disability and regular attendance of a physician must be

16

given to the Company within 30 days of the request for the proof."
*Id.* (alteration in original). To determine "when the contractual
limitation period began" the Ninth Circuit analyzed when, if at all,
the defendant asked the plaintiff for a "request for the proof" or
to provide a "proof of claim." *Id.*  The trial court concluded that
a letter to the plaintiff dated June 1, 1995, constituted an
adequate "request for proof" which triggered the limitations period.
*Id.*  The Ninth Circuit disagreed:

> The June 1, 1995, letter (and the September 29, 1995,
> letter) informed Mogck of Unum's decision to discontinue
> the disability payments past June 25, 1995. However,
> nowhere in either letter are the terms 'proof,' 'request
> for the proof,' or 'proof of claim' utilized. Without an
> adequate request for the proof of claim, Unum never took
> the steps necessary to trigger the running of the
> contractual time limitation under the policy.

*Id.* Plaintiff contends that, just as in *Mogck*, neither defendants'
letter from May 12, 2004, nor any other letter contained the term
"proof of claim" or "proof," and, therefore, the contractual
limitations period was never triggered.  Defendants argue that the
ERISA plan at issue in *Mogck* was an insured plan, i.e., an
"insurance policy," and the Ninth Circuit applied heightened
scrutiny to the plan after labeling it a "contract of adhesion." *See
id.* at 1028.

It is true that the *Mogck* court analyzed that ERISA plan as an
insurance policy and applied the rule that it should be construed
"strictly" against the drafter. *Id.* at 1029 (quotation marks
omitted).  However, *Mogck's* underlying principle is not confined to
insured plans.  Regardless of the context, "the steps necessary to
trigger the running of [a] contractual time limitation," *id.* at
1028, must be taken, and the defendant who raises the contractual

17

time limitation as an affirmative defense must establish that those steps were, in fact, taken. *Cf. Blas v. Talabera*, 318 F.2d 617, 621 (9th Cir. 1963) ("Without proof of when the statute of limitations began to run, appellant cannot prevail on this point.").

Here, neither the May 12, 2004, letter nor the final denial letter from Wachovia's Benefits Committee "required" a "proof of claim," or proof of anything, from plaintiff.  Defendants have not proffered any evidence of a plan definition of the term "proof of claim" or a demand for proof of claim.  It is defendants' burden to prove the applicability of the contractual limitations period and when it started to run.  Defendants have the burden of persuasion on this affirmative defense, they must "establish beyond controversy every essential element of it[]." *Southern Cal. Gas. Co v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (quotation marks omitted); *see also Humanitarian Law Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049, 1056 (C.D. Cal. 2006).  Defendants have not met their burden to establish that the contractual limitations period was triggered.  Defendants' motion for summary judgment on the private limitations is denied.

**B. <u>The Decision To Terminate Plaintiff's LTD Benefits</u>**

Defendants maintain that, even if the one-year limitations period does not bar plaintiff's claim, the decision to terminate his LTD benefits must be upheld on the merits under an abuse of discretion standard.  Plaintiff argues that the court should engage in a *de novo* review.  Before analyzing this issue, plaintiff raises an argument that must be addressed at the outset.

**1. <u>Determining which plan controls</u>**

In September 2001, Wachovia and First Union Corporation merged.

(Doc. 17, Ex. C at 15.)   As a threshold matter, plaintiff argues that Wachovia acted unreasonably because it interpreted the wrong plan altogether.   According to plaintiff, the controlling plan here is the "First Union Corporation Long Term Disability Plan" effective January 1, 1998 (the "First Union Plan"), not the subsequent Wachovia Long Term Disability Benefit Plan, which has been referred to as the "Wachovia Plan."   The Wachovia Plan was amended and restated on January 1, 2003.   Plaintiff attached the First Union Plan to a declaration submitted in connection with the motion. (Doc. 25, Ex. E.)[2]

Plaintiff attempts to invoke the First Union Plan because he believes it contains a more favorable definition of pre-disability earnings.   Under the First Union Plan, "Pre-Disability Earnings" are defined as "the Participant's monthly rate of earnings for benefits purposes from the Participating Employer on the day immediately preceding the first day of Disability." (Doc. 25, Ex. E at 5.) Plaintiff asserts that this definition takes into account "all of [his] earnings" (Doc. 26 at 8) for purposes of determining pre-disability earnings.   The Wachovia Plan takes into account only a participant's "Benefits Eligible Compensation" or BEC for purposes of determining pre-disability earnings.   As Wachovia explained in its final denial letter, not all of the remuneration plaintiff received during the twelve months preceding his disability was included in plaintiff's BEC.   Defendants contend that plaintiff should be estopped from raising his argument as to the First Union

---

[2]    Although it is not entirely clear, plaintiff apparently worked for First Union Corporation before the merger.

Plan and that it fails on the merits in any event.

Plaintiff's complaint makes no reference to the First Union Plan or to First Union Corporation.  On the contrary, the complaint alleges that plaintiff was a participant in the "Wachovia Disability Plan" and that "Defendants improperly terminated [his] disability benefits to which he is entitled under the terms of the Wachovia Disability Plan."(Compl. ¶¶ 9, 32.)  In addition to these references to the "Wachovia Disability Plan," plaintiff noted that the "Plan defines and provides that Pre-Disability Income shall be calculated and figured on a 'rolling 12-month' average." (Compl. ¶ 31.)  This is an explicit reference to the Wachovia Plan, which utilizes this terminology for purposes of determining a participant's pre-disability earnings.  This terminology is not in the First Union Plan later submitted by plaintiff.  Plaintiff did not allege in his complaint that he was owed benefits under the First Union Plan and instead referred to the "Wachovia Disability Plan" and employed terminology from the Wachovia Plan.  Similarly, at no point during the administrative process did plaintiff raise the contention that the First Union Plan controlled.

The Scheduling Order in this case (Doc. 12), which defendants attached to their reply papers (Doc. 31, Ex. A), contains "Admitted Facts Which Are Deemed Proven Without Further Proceedings." Included among these facts are that plaintiff was a participant in the "Plan," defined as the "Wachovia Corporation Long Term Disability Plan," that plaintiff "applied for, and was granted, LTD benefits by the Plan from January 14, 2003, through January 31, 2004," and that the "Plan terminated Plaintiff's LTD benefits effective February 1, 2004." (Doc. 31, Ex. A at 4.)   In the

"Uncontested" and "Contested" legal and factual issues set forth in the Scheduling Order, plaintiff made no mention of the First Union Plan, and no reference to the First Union Plan otherwise appears in the Scheduling Order.  On the other hand, "[w]hether Plaintiff is entitled to benefits under the terms of the Plan" (Doc. 31, Ex. A at 5) is listed as contested.  In response to defendants' separate statement of undisputed material facts, plaintiff did not dispute that he was a participant in the Wachovia Plan and that his complaint seeks damages allegedly owed under the terms of the Wachovia Plan. (Doc. 16, UMF Nos. 18, 64) (Doc. 23, UMF Nos. 18, 64.)   These are judicial admissions.

Plaintiff conceded at the hearing on this motion that he raised the issue of the applicability of the First Union Plan for the first time in his opposition to the motion for summary judgment. *See Pickern v. Pier 1 Imps. (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006) (refusing to allow the plaintiff to assert new specific factual allegations in support of a claim when they were "presented for the first time in [the plaintiff's] opposition to summary judgment"); *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (quotation marks omitted).  Even assuming that plaintiff is not barred from raising his argument that the "provisions of the earlier disability policy" (Doc. 23 at 4) apply, it lacks merit in any event.

In his opposition papers and at the hearing on the motion, plaintiff argued that the date he became disabled (July 16, 2002), which occurred before the 2003 effective date of the amended

21

Wachovia Plan, compels the conclusion that the earlier First Union Plan controls.   Plaintiff posits that by virtue of the date he became disabled, he was vested with the right to long-term disability benefits under the First Union Plan.   Plaintiff makes this argument without citing to any language in the First Union Plan or any legal authority.

Plaintiff's argument fails.   In his appeal letter dated April 15, 2004, plaintiff argued that when pre-disability income is

> calculated under the policy, it is calculated on a rolling 12-month basis, with the total amount being divided by 12. (See definition of Benefits Eligible Compensation as amended December 22, 2000, effective January 1, 2001.) . . . It is inconsistent to use a rolling 12-month amount to determine 'pre-disability earnings', yet use a single month's worth of earnings to calculate monthly earnings.

(Doc. 18, Ex. R at 2.)   Plaintiff repeated this in his opposition to the instant motion, stating,

> [w]ith respect to the calculation of earnings for disability, each earning is calculated under the policy and concept of a 'rolling 12 month basis' with the total amount being divided by 12. (Definition of benefits eligibility compensation as amended on December 22, 2000, effective January 1, 2001.)

(Doc. 26 at 10.)   "Benefits Eligible Compensation" and the "rolling 12-month basis" are terms that do *not* appear in the First Union Plan.   Plaintiff's own letter and argument in this motion concede that the concept of "Benefits Eligible Compensation" was in effect in 2001, well *before* his date of disability in July 2002, and well *after* the First Union Plan went into effect in 1998.   This explains why plaintiff made no mention of the 1998 First Union Plan in his complaint or during the administrative appeal process.   Because plaintiff admits that Benefits Eligible Compensation was utilized

1  by 2001 and because the First Union Plan from 1998 does not contain
2  this term, plaintiff's claim that the First Union Plan from 1998 was
3  the "policy that was in affect (sic) when the disability occurred"
4  (Doc. 26 at 18) is contradicted by his own concession.  Plaintiff's
5  argument for application of the 1998 First Union Plan is premised
6  on the factual assumption that the plan in effect at the time of his
7  disability in July 2002 did not utilize Benefits Eligible
8  Compensation as the basis for determining pre-disability earnings.
9  As shown above, this premise is false and plaintiff's argument is
10 without merit.

11      Plaintiff's argument also rests on a false legal premise –
12 that disability benefits automatically vest at the moment of
13 disability.  In *Grosz-Salomon v. Paul Revere Life Insurance Co.*, 237
14 F.3d 1154, 1159-61 (9th Cir. 2001), the Ninth Circuit rejected this
15 view.  The court concluded that "an employee's rights under an ERISA
16 welfare benefit plan do not vest unless and until the employer says
17 they do" and because vesting of welfare benefits is "an extra-ERISA
18 commitment [such vesting] must be stated in clear and express
19 language."  *Id.* at 1160 (quotation marks omitted).  Accordingly,
20 "[t]hat [plaintiff] became permanently disabled and filed her
21 disability claim while the first policy was in effect is irrelevant;
22 it does not entitle her to invoke that plan's provisions in
23 perpetuity." *Id.*  Absent clear and express language indicating that
24 benefits are vested in a particular plan, the plan in effect at the
25 time "the claim for wrongful termination of benefits arose," i.e.,
26 the plan in effect "at the time the benefits are denied," is
27 controlling. *Id.* at 1159 (quotation marks omitted); *accord Hackett*

28

*v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003).   Plaintiff has not pointed to any provision or language in the First Union Plan which supports his view that his rights to disability benefits vested under the First Union Plan (and again, as discussed above, his own concessions and argument reveal that the First Union Plan from 1998 was not the operative plan at the time of his disability).   Absent such a showing, *Grosz-Salomon* applies and the plan in effect when Wachovia denied plaintiff's LTD benefits, which was the Wachovia Plan, controls.   This conclusion is further supported by *Shane v. Albertson's Inc.*, 504 F.3d 1166 (9th Cir. 2007), which defendants cite in their reply brief.

In *Shane*, the court determined which of two LTD plans governed the plaintiff's LTD benefits: a "1993 Disability Plan" or a "2002 Disability Plan."   *Id.* at 1168.   The court focused on language in the 1993 Disability Plan that covered amendments:

> [a]ny amendment to the Plan shall be effective only with respect to Total Disabilities which commence on and after the effective date of the amendment. Total Disabilities commencing prior to the effective date of a Plan amendment are to be provided for under the terms of the Plan in effect at the time those disabilities commenced.

*Id.* The court found that "[i]mportantly, Ms. Shane began receiving her LTD benefits on January 31, 2000, thus qualifying her as a 'Total Disability' under the scope of the 1993 Disability Plan and well prior to the effective date of the . . . 2002 Disability Plan." *Id.* at 1168-69.   Relying in large measure on the language quoted above, the Ninth Circuit concluded that the 1993 Disability Plan applied even though the decision to terminate benefits was made after the 2002 Disability Plan went into effect.   *Id.* at 1169.   The

*Shane* court distinguished *Grosz-Salomon* on the ground that nothing in the plan language in *Grosz-Salomon* demonstrated that the plaintiff there had any vested rights. *Id.* By contrast, in *Shane*, the plan language quoted above, and other language in the 2002 Disability Plan, clearly assured plaintiff that her rights to disability benefits would be governed by the prior plan, i.e., the 1993 Disability Plan. *Id.* In this case, plaintiff received no such assurance.

The First Union Plan (Doc. 25, Ex. E at 19) contains the following language in the sections covering plan amendments and termination (Section 5.1 and 5.2 respectively):

> **Amendment**. The Employer shall have the right at any time . . . to amend the Plan. . . . No amendment shall adversely affect the payment of Benefits to which an individual was *entitled* under the terms of the Plan prior to the date of amendment.

> **Termination**. Although the Employer intends to maintain the Plan for an indefinite period, the Employer reserves the absolute right to terminate or partially terminate the Plan at any time, for any reason . . . . Any termination or partial termination of the Plan shall not adversely affect the payment of Benefits to which which (sic) a covered individual was *entitled* under the terms of the Plan prior to the date of termination or partial termination.

(Emphasis added.)    The LTD benefits at issue here are those allegedly due (and denied) in February 2004 and in the months following.  Plaintiff was not "entitled" to these benefits prior to when the payments became due. *See Geiger v. Hartford Life Ins. Co.*, 348 F. Supp. 2d 1097, 1108 (E.D. Cal. 2004) ("'Rights to benefits do not accrue prospectively. [The beneficiary does] not, upon initial determination of eligibility, accrue a right to benefits

indefinitely; instead his right to those benefits accrues as the payments become due.'" (alteration in original) (*quoting Hackett*, 315 F.3d at 774)).  When the payments became due in 2004, Wachovia's Plan was in effect, not the 1998 First Union Plan, and plaintiff does not contend otherwise.  Therefore, plaintiff's argument that the First Union Plan controls lacks merit.

Finally, that the First Union Plan controls is belied by other admissions and evidence in the record.  Plaintiff's response to defendants' separate statement of undisputed material facts does not dispute that he was a participant in the Wachovia Plan and that his complaint seeks damages allegedly due under the terms of the Wachovia Plan. (Doc. 16, UMF Nos. 18, 64) (Doc. 23, UMF Nos. 18, 64.)  Every letter in the record indicates that plaintiff was issued LTD benefits under a Wachovia plan, not under a First Union Corporation plan.  There is no reason for Wachovia to initially issue benefits in 2003 under its plan and then rely on the First Union Plan from 1998 to determine plaintiff's continuing eligibility for LTD benefits.  The evidence does not support plaintiff's argument that the First Union Plan is the controlling one.

For all these reasons, the Wachovia Plan governs.

## 2. <u>Determining the standard of review</u>

"When a plan unambiguously gives the plan administrator discretion to determine eligibility or construe the plan's terms, a deferential abuse of discretion standard is applicable." *Burke*, 544 F.3d at 1023-24 (*citing Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc)).  Here, the "Plan Administrator" is the "Employer" and the "Employer" is defined as

26

"Wachovia Corporation, the sponsor and named fiduciary of the Plan."
(Doc. 17, Ex. C at 5, 27).    Section 4.3 of the Wachovia Plan
provides in pertinent part:

> The Plan Administrator will have the exclusive right and
> the sole discretionary authority to interpret the terms
> and provisions of the Plan and to resolve all questions
> arising thereunder, including, without limitation, the
> authority to determine eligibility for Benefits and the
> right to resolve and remedy ambiguities, inconsistencies
> or omissions in the Plan, and, Subject to Section 4.7,
> such action will be conclusive.

(Doc. 17, Ex. C at 27.)   This language unambiguously grants Wachovia
broad discretion to interpret the plan's terms, and to determine
eligibility.   The abuse of discretion standard applies. *See Burke*,
544 F.3d at 1024 ("The Plan here unambiguously grants the Committee
the discretion to construe the Plan's terms. As a result, an abuse
of discretion standard is appropriate."); *see also Abatie*, 458 F.3d
at 965.    This, however, does not end the inquiry into the
appropriate standard.

In *Abatie* and *Burke*, the Ninth Circuit discussed how to apply
the abuse of discretion standard when the plan administrator acts
in the dual role of administering and funding the plan. *Abatie*, 458
F.3d at 967; *Burke*,544 F.3d at 1024-27.   The Supreme Court also
recently discussed this issue in *Metropolitan Life Insurance Company
v. Glenn*, 554 U.S. __, 128 S.Ct. 2343, 2348, 2350-52 (2008).   In
such cases, a "structural conflict of interest" is created in that
the administrator "has a financial incentive to deny claims because
every dollar not paid in benefits is a dollar that will not need to
be contributed to fund" the plan. *Burke*, 544 F.3d at 1026.   Where
a structural conflict of interest exists, a court still applies the
abuse of discretion standard, but the "structural conflict of

interest must be considered as a factor in evaluating whether the Plan abused its discretion in terminating [the plaintiff's] benefits." *Id.; see also Glenn,* 128 S.Ct. at 2350-52; *Abatie*, 458 F.3d at 967-69.

Defendants acknowledge that the Wachovia Plan is self-funded, i.e., Wachovia pays out the benefits, and Wachovia acts as the Plan Administrator with the final say on whether a benefits denial is upheld.  (Doc. 15 at 19.)   There is a structural conflict of interest and it must be considered as a factor in evaluating whether there has been an abuse of discretion.

In examining the nature of the conflict in *Burke*, the court considered whether other structural features "mitigated" the severity of the conflict. 544 F.3d at 1025.  For example, although the employer administered the plan and paid out benefits, the benefits were paid out of trusts the employer had established and not directly out of its pocket. *Id.*  The Ninth Circuit viewed this as a factor that mitigated the structural conflict of interest. *Id.* Here, there is documentation in the record indicating that benefits are paid by Wachovia "either directly or through trusts, which are established exclusively for plan purposes." (Doc. 17, Ex. B).  This lessens the structural conflict of interest to the extent benefits are paid out of the trusts.  In *Burke*, the court also noted that "[b]ecause the Plan is administered by Pitney [the employer], rather than an insurer, this aspect of the Plan tends to increase the Plan's structural conflict of interest in comparison to the plan at issue in" *Glenn*, an insurer administered and funded plan. *Id.* at 1027*.*  Here, Wachovia both administers and funds the Wachovia Plan,

28

which tends to increase the structural conflict of interest in comparison to the plan at issue in *Glenn*.

The conflict of interest is a factor that must be considered in deciding whether Wachovia abused its discretion in terminating plaintiff's LTD benefits.

### 3.   Abuse of discretion

"In evaluating whether an abuse of discretion occurred, the court should make something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage, and adjust its level of skepticism in proportion to its evaluation of the conflict of interest." *Pannebecker v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1213, 1218 (9th Cir. 2008) (quotation marks omitted). "In the ERISA context, even decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion. An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact.*" Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005) (citation and quotation marks omitted). An "abuse of discretion" is synonymous with "arbitrary or capricious," *Vizcaino v. Microsoft Corp.*, 120 F.3d 1006, 1009 (9th Cir. 1997), and the "touchstone of arbitrary and capricious conduct is unreasonableness," *Barnett v. Kaiser Foundation Health Plan, Inc.*, 32 F.3d 413, 416 (9th Cir. 1994) (quotation marks omitted). The "inquiry is not into whose interpretation of plan documents is most persuasive, but whether the

29

plan administrator's interpretation is unreasonable." *Id.* (quotation marks omitted).

### a. Eligible Functional Incentive Pay

Plaintiff argues that defendants have not established, in their moving papers, how plaintiff's Eligible Functional Incentive Pay was determined. (Doc. 26 at 9.)   Appendix B refers to Eligible Functional Incentive Pay and contains various pay codes.[3]  Plaintiff argues that none of these pay codes are referred to in his pre-disability pay stubs (Doc. 26 at 15-16) so plaintiff takes issue with Wachovia's conclusion that "not all of the remuneration [he] received from Wachovia qualified as eligible functional incentive pay" under the Wachovia Plan.   For several reasons, plaintiff's argument lacks merit.

First, "Draw Earnings" and "Comm/Pretax Earnings," which are listed on Appendix B under Eligible Functional Incentive Pay, *do* appear on Plaintiff's pre-disability pay stubs in the "Hours And Earnings" section. (Doc. 18, Ex. I.)  Plaintiff's Draw Earnings and Comm/Pretax Earnings for the twelve months preceding his disability add up to the $153K figure that Wachovia computed for plaintiff's Eligible Functional Incentive Pay.[4]   Second, Wachovia explicitly

---

[3]     Section 3.7(b)(4)(iii) provides that "Compensation" means "seventy percent (70%) of [a participant's] 'eligible functional incentive pay' (*as set forth in Appendix B*)." (Emphasis added.)

[4]     Wachovia's final denial letter stated that plaintiff's Eligible Functional Incentive Pay was $150,384.43. When adding plaintiff's Draw Earnings and Comm/Pretax Earnings, as taken from plaintiff's pay stubs during the relevant period, which defendants included in their moving papers (Doc. 18, Ex. I), the total comes to $150,384.41.

informed plaintiff "[i]f you would like a specific break down" of the difference between plaintiff's eligible functional incentive pay and the remuneration he received pre-disability from Wachovia, "please let me know." (Doc. 17, Ex. Y at 4.)   Plaintiff has not explained why he did not accept Wachovia's offer and obtain this information informally or during the course of litigation.   That Wachovia offered to provide a breakdown of his Eligible Functional Incentive Pay cuts against plaintiff's suggestion that Wachovia was trying to "hide the ball."   Third, there is no evidence that Wachovia actually ignored the pay stubs that plaintiff submitted during the appeal process.   Rather, its letter explained that not all remuneration plaintiff earned at Wachovia qualified as Eligible Functional Incentive Pay.   Finally, there is no evidence that in determining plaintiff's Eligible Functional Incentive Pay, Wachovia made clearly erroneous factual findings.

### b. Monthly Earnings

Second, plaintiff argues that Wachovia's interpretation and use of the plan term "Monthly" to mean a single month's worth of earnings is erroneous and is "wholly inconsistent" with how that term is used throughout the plan. (Doc. 26 at 9.)   Plaintiff notes that for purposes of determining Pre-Disability Earnings, the Plan incorporates a twelve month concept in that it uses a Rolling Twelve Month Amount.   According to plaintiff, "[i]t is inconsistent to use a 'rolling 12 month amount' to determine 'pre-disability earnings' as has been done here and yet use a single month's worth of ending earnings to calculate 'monthly earnings' post disability." (*Id.* at 10.)   Plaintiff's argument is not persuasive.

**31**

The Wachovia Plan does not provide a definition of the term "Monthly." Absent a controlling definition, "terms in an ERISA plan should be interpreted in an ordinary and popular sense as would a person of average intelligence and experience." *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007) (quotation marks omitted). When "the plan is silent as to the definition" of a term, the Ninth Circuit "look[s] to the dictionary definition to determine the ordinary and popular meaning." *Id.* at 1195.

Based on a dictionary definition of the word "monthly," the ordinary meaning is "once a month" or "by the month" when used as an adverb and "of or relating to a month," "payable or reckoned by the month," "lasting a month," or "occurring or appearing every month" when used as an adjective. Merriam-Webster's Online Dictionary, http://www.merriam-webster.com (last visited Nov. 19, 2008). Wachovia interpreted the term "Monthly Earnings" to mean a month's worth of earnings. This interpretation is consistent with the ordinary meaning of the word "monthly" in that it means "by the month," "of or relating to a month," or "lasting a month." Accordingly, Wachovia's interpretation is not unreasonable.

At the hearing on this motion, plaintiff suggested that the term "Monthly" is ambiguous – it could mean more than one month – and it should be interpreted against the drafter as provided by the doctrine of *contra proferentum*. The Wachovia Plan is not, however, an insurance policy or contract – it is a self-funded disability plan. "[T]he doctrine of *contra proferentum* is not applicable to self-funded ERISA plans" when, as here, they "bestow explicit discretionary authority upon an administrator to determine

eligibility for benefits or to construe the terms of the plan."
*Shane*, 504 F.3d at 1169 (quotation marks omitted).  Moreover, "the
inquiry is not into whose interpretation of plan documents is most
persuasive, but whether the plan administrator's interpretation is
unreasonable."  *Barnett*, 32 F.3d at 416.  Even if "Monthly" could
be interpreted to mean more than one month, this interpretation
would not help plaintiff.  His post-disability earnings exceeded the
threshold three months in a row.

Plaintiff argues that "Monthly Earnings" should mean his post-
disability earnings on an "annual basis divided by twelve." (Doc.
26 at 10.)  Although this definition of "Monthly" departs from the
dictionary definition, plaintiff contends that this interpretation
of "Monthly" would be consistent with the twelve-month concept
(i.e., the Rolling Twelve Month Amount) that the Wachovia Plan
utilizes for purposes of determining pre-disability earnings.
Plaintiff argued in his opposition brief and at the hearing on this
motion that courts must interpret contractual terms consistently.
*See Gilliam*, 488 F.3d at 1194 ("[W]e endeavor to interpret each
provision consistent with the entire document such that no provision
is rendered nugatory")*; Tanadgusix Corp. v. Huber*, 404 F.3d 1201,
1205 (9th Cir. 2005) ("We construe the contract by reading it as a
whole and interpreting each part with reference to the entire
contract."); *Kassbaum v. Steppenwolf Prods., Inc*. 236 F.3d 487, 491
(9th Cir. 2000) (noting that words in a contract must be read in
context in that the "whole of a contract is to be taken together,
so as to give effect to every part, if reasonably practicable, each
clause helping to interpret the other" (*quoting* Cal. Civ. Code §

1641)).  The term "Monthly Earnings," which is used for purposes of determining post-disability earnings, does not appear in and is isolated from the plan's separate definition of "Pre-Disability Earnings," which contains its own special set of subsidiary terms such as the "Rolling Twelve Month Amount."  The textual asymmetry between the more general "Monthly Earnings" term and the considerably more nuanced and structurally isolated "Pre-Disability Earnings" term does not permit the construction that plaintiff champions.  *Cf. Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) ("[T]he textual asymmetry between the two statutes precludes reliance on FLSA cases when construing ERISA's concept of 'employee.'"); *see also Kassbaum*, 236 F.3d at 491 (noting that the scope of a term in a contract "extends only to those things concerning which it appears that the parties intended to contract" (*quoting* Cal. Civ. Code § 1648)).  More important, Wachovia did not act unreasonably in declining to interpret "Monthly Earnings" in the manner that plaintiff suggests.

Plaintiff argues that interpreting the term "Monthly Earnings" to mean a single month's income defeats an "insurer's (sic) reasonable expectation of benefits under the policy." (Doc. 26 at 9.)  Plaintiff's reliance on the doctrine of "reasonable expectations of the insured," based on *Saltarelli v. Bob Baker Group Medical Trust*, 35 F.3d 382, 385 (9th Cir. 1994) is unpersuasive.  In *Saltarelli*, the Ninth Circuit adopted the reasonable expectations of the insured doctrine as a "principle of the uniform federal common law informing interpretation of ERISA-governed *insurance contracts*." *Id.* at 385, 387 (emphasis added).  The court referred

**34**

to the doctrine as the "strong modern trend in insurance contract interpretation." *Id.* at 386.  The doctrine provides:

> an insurer wishing to avoid liability on a policy purporting to give general or comprehensive coverage must make exclusionary clauses conspicuous, plain, and clear, placing them in such a fashion as to make obvious their relationship to other policy terms, and must bring such provisions to the attention of the insured.

*Id.* Here, the Wachovia Plan is not an insurance policy or contract. At least one district court has concluded that the doctrine of reasonable expectations, just like the doctrine of *contra proferentum*, is inapplicable to self-funded benefit plans. *Scharff*, 2007 WL 2947566, at *8 ("[N]othing in *Saltarelli* suggests the Ninth Circuit intended to extend the reasonable expectations doctrine to interpreting self-funded contracts."). *Scharff* also distinguished *Saltarelli* on the grounds that *Saltarelli* dealt with a medical exclusionary provision, i.e., a pre-existing condition exclusion, which was not at issue in *Scharff*. *Id.*  Here, just as in *Scharff*, the doctrine of reasonable expectations does not apply given that the Wachovia Plan is a self-funded welfare benefit plan, not an insurance policy or contract, the term at issue is not an exclusionary provision that subtracts from purported coverage, and the plan gives Wachovia full discretionary authority to interpret its provisions.[5]  Moreover, Liberty Life specifically advised

---

[5]    In *Shane*, the Ninth Circuit disapproved of the notion that the doctrine of *contra proferentum* could be used to interpret plan provisions so as to align them "with the reasonable expectations of the insured" when the plan at issue is self-funded and it "bestow[s] discretionary authority upon [the] administrator to determine eligibility for benefits or to construe the terms of the plan." 504 F.3d at 1169 (quotation marks omitted).

plaintiff that his earnings at Capitol Lending would be reviewed on a *monthly* basis for purposes of processing his LTD benefits.  And Wachovia's interpretation of the term "Monthly Earnings" to mean a month's worth of earnings is consistent with the ordinary meaning of the term "monthly."  Accordingly, the doctrine of reasonable expectations would be unavailing even if it applied.[6]

The fact that a structural conflict of interest exists here does not lead to the conclusion that Wachovia abused its discretion when it interpreted "Monthly Earnings" to mean a month's worth of earnings.  Liberty Life, acting as a claims administrator, also concluded that "Monthly Earnings" meant a month's worth of earnings. Liberty Life is compensated by Wachovia not on the basis of whether benefits are granted or denied, but on the total number of employees in active employment covered under the Wachovia Plan as of the first day of each month, i.e., on a per capita basis, which relates to the volume of work not the merits of benefits determinations. (Doc. 16,

---

[6]     To the extent plaintiff argues that it violated his reasonable expectations when Wachovia used only his Eligible Functional Incentive Pay (Appendix B) to compute his BEC or Pre-Disability Earnings instead of taking into account all of his earnings during the relevant period, this argument is equally meritless.  Again, the Wachovia Plan is a self-funded welfare benefit plan, not an insurance policy or contract, Eligible Functional Incentive Pay is not an exclusionary provision that subtracts from purported coverage, and the plan gives Wachovia full discretionary authority to interpret its provisions.  In any event, no language in the plan creates an expectation that all of plaintiff's income will be included in his Benefits *Eligible* Compensation.  And, as mentioned, "Draw Earnings" and "Comm/Pretax Earnings" are clearly listed on Appendix B, and "Draw Earnings" and "Comm/Pretax Earnings" clearly appear on plaintiff's pre-disability pay stubs under the "Hours And Earnings" section.

UMF 16) (Doc. 23, UMF 16.)   When plaintiff's counsel notified Liberty Life that plaintiff had potential employment lined up with Capitol Lending, Liberty Life responded that once plaintiff is employed "we will need verification of his earnings on a *monthly* basis in order to process his Long Term Disability benefit." (Doc. 18, Ex. L) (emphasis added.)   This request is consistent with interpreting "Monthly Earnings" to mean a month's worth of earnings and alerted plaintiff to the fact that this earnings and eligibility were going to be scrutinized on a monthly basis.   When the appeal reached Wachovia, it interpreted "Monthly Earnings" in the same manner Liberty Life did, according to its plain language.   There is no evidence that Wachovia has interpreted "Monthly Earnings" differently on different occasions.   On the entire record, Wachovia did not err or abuse its discretion in interpreting "Monthly Earnings" as it did.

### c. Discontinuation of Benefits

Plaintiff argues that defendants misinterpreted the rule regarding discontinuance of benefits.   Plaintiff claims that the "contract in question does not state that benefits will cease when an employee's earnings reach or exceed 80% of his 'compensation' or 'Eligible Functional Incentive Pay,' it provides that benefits will cease when the monthly earnings are greater to, or equal to, 80% of his pre-disability earnings." (Doc. 26 at 12.) Plaintiff contends that "[i]f defendants intended to provide for discontinuation of the employee's benefits when his 'earnings' equaled or exceeded 80% of his 'Functional Incentive Pay,' it could and should have said so." (Doc. 26 at 13.)

37

Plaintiff's argument is no more than a quarrel with a multi-step analysis under the plan, i.e., an argument that it is improper for one definition to lead to another. Wachovia explained in detail how it reasoned to its conclusion in a logical sequential analysis. That the Wachovia Plan requires a multi-step analysis is not a basis for finding an abuse of discretion.

### C. Additional Evidence

Plaintiff argues that the court should receive additional evidence outside the administrative record for two reasons: (i) because Wachovia failed to rely on the First Union Plan in analyzing plaintiff's disability claim; and (ii) Wachovia only considered a month's worth of post-disability earnings and not the "twelve months" of post-disability earnings that were involved. (Doc. 26 at 18.) Both of these arguments are based on premises already rejected. The First Union Plan from 1998 is not controlling here and there was no abuse in discretion in interpreting "Monthly Earnings" to mean a month's worth of earnings. No evidence on such matters will be considered. *Abatie*, 458 F.3d at 970 ("[W]e continue to recognize that, in general, a district court may review only the administrative record when considering whether the plan administrator abused its discretion, but may admit additional evidence on de novo review.").

### V. CONCLUSION

The court concludes that there was no abuse of discretion in terminating plaintiff's LTD benefits. Defendants' motion for summary judgment is granted.

IT IS SO ORDERED.

Dated:    December 1, 2008             /s/ Oliver W. Wanger
                                    UNITED STATES DISTRICT JUDGE